537 So.2d 1103 (1988)
Lawrence Hayden BLAYLOCK, Jr., Appellant,
v.
The STATE of Florida, Appellee.
No. 87-2086.
District Court of Appeal of Florida, Third District.
December 27, 1988.
As Modified on Denial of Rehearing and Rehearing March 7, 1989.
*1105 Cooper, Wolfe & Bolotin and Marc Cooper, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Michele L. Crawford, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and BASKIN and FERGUSON, JJ.
As Modified on Denial of Rehearing and Rehearing En Banc March 7, 1989.
FERGUSON, Judge.
Lawrence Blaylock, Jr. appeals his conviction for first-degree murder.
On May 13, 1986, the defendant walked up to Wayne Boynton's parked car and, at close range, fired two machine gun blasts, killing Boynton instantly. Blaylock then unloaded the weapon, picked up a hand gun, and walked into the nearby offices of a family-run business. He went first to the office of Denise Dumas, who was a friend of Boynton, and apologized to her for having killed Boynton. He proceeded into another office, took control of a loudspeaker system, and announced his intention to kill himself. A half hour later police and family members persuaded him to come out. At trial Blaylock's attorneys argued that he was insane when he shot Boynton. The State, however, described the murder as premeditated and motivated by a jealous rage over Denise Dumas's personal involvement with Boynton. A jury found the defendant guilty of first-degree murder and the court sentenced him to a term of life imprisonment.
Blaylock contends that he is entitled to a new trial on four grounds: (1) juror misrepresentation or nondisclosure of material facts in response to questions asked during voir dire, (2) exclusion of statements made by the defendant to a relative two weeks prior to the homicide which evidenced a delusional state of mind, (3) comment by the State on the defendant's right to remain silent, and (4) prosecutorial denigration of the insanity defense during closing argument. Finding no error in the court's refusal to grant a new trial, we affirm Blaylock's conviction and sentence.
In the day-and-a-half jury selection process prospective jurors were first addressed as a group by the judge who inquired whether any of them had ever been a witness in a criminal proceeding. Juror Harold Smoak responded affirmatively by raising his hand. Later, during voir dire, Smoak gave the prosecutor his address and said he was a manager of a Burger King. There was an exchange by Smoak and the prosecutor as the State further explored the subject:
Q. You said you were a witness to a crime?
A. I was held hostage.
Q. In Burger King?
A. No.
Q. During a robbery?
A. No, it wasn't a robbery.
Defense attorneys told the prospective jurors that the only issue in the case was whether the defendant was insane at the time of the shooting. The defendant's voir dire then focused on the jurors' opinions of an insanity defense as most of the jurors, admittedly, were unreceptive to the theory. After one juror expressed skepticism about the validity of such a defense, juror Smoak spoke out, expressing his belief that an insanity defense could be valid and not just a ploy. When defense attorneys asked the group whether anyone had been "exposed" to mental illness or emotional problems Smoak again responded, stating that he counseled high-school seniors. Blaylock's attorneys, concluding that Smoak could be receptive to the insanity defense, decided not to question him further. As conceded in appellant's brief, defendant's counsel feared that further inquiry might turn their only "friendly" juror into a hostile one. Smoak subsequently became the jury foreman.
Several days after a guilty verdict was returned, Blaylock moved for a new trial claiming that he had uncovered information showing that Smoak lied and concealed information during voir dire. Specifically, the newly discovered facts which allegedly belied answers given during voir dire were: *1106 (1) Smoak had been held hostage during a robbery at Burger King; (2) Smoak suffered from nightmares as a result of the hostage incident; and (3) Smoak failed to mention other times when he had witnessed crimes. To the court's questions as to why defense counsel chose not to examine juror Smoak individually during voir dire, Blaylock's counsel responded that the decision was a tactical one based on the nature of the defense and the available information about the prospective jurors.
THE COURT: Mr. Sadow, when he said to you that he was held as hostage ... you didn't think it probative to find out under what conditions that hostage situation took place?
MR. SADOW: Your honor, I guess that was a judgment call which obviously, I should have gone into deeper in light of what we know now. At that time, having decided that it was no longer work-related but a personal matter 
THE COURT: I understand that. I'm just  when he told you that he counseled high school seniors 
MR. SADOW: If anything appeared from that answer, then he would be the type of juror that we wanted because he was in favor towards counseling psychological and psychiatric type things, treatment which would indicate to us that he would be one of our better jurors if he answered the question truthfully ...
THE COURT: You asked the question, "How many of you have been exposed?"
You don't buy that as a general term which means normally that they have seen people involved with it or know of people involved in it, and then you ask them if they came by that situation either through their own experiences or through friends or family? Is there a difference between the work exposure and suffered yourself?
Is there?
MR. SADOW: To be honest with your Honor, the question comes from the jury questionnaire ...
In formulating, not only the questions from the questionnaire and the jury survey poll prior to that, there was a great deal of discussion over whether we should use the word suffered or exposure, and it was determined that exposure was a broader term that would allow them, not only to talk in terms of themselves having suffered, if that's the appropriate word, but also to show whether they had any dealing outside of their personal experiences.
The questions presented on this point are whether there was a false answer to a material and relevant inquiry or a failure to disclose a material fact and no lack of diligence by the complaining party.
The appellant contends, essentially, that Smoak's false answers to material questions on voir dire deprived him of a fair and impartial trial, relying on Loftin v. Wilson, 67 So.2d 185 (Fla. 1953) and Redondo v. Jessup, 426 So.2d 1146 (Fla. 3d DCA), rev. denied, 434 So.2d 887 (Fla. 1983). In response the State argues that when a question asked during voir dire is not material to a juror's qualifications, a defendant is not deprived of his right to a fair trial by a juror's failure to respond truthfully, citing Story v. State, 53 So.2d 920 (Fla. 1951) (en banc) (false answer to non-material question does not have the effect of concealing any juror disqualification; thus appellant's contention that he was deprived of his right to an intelligent challenge is without merit), cert. denied, 343 U.S. 958, 72 S.Ct. 1055, 96 L.Ed. 1357 (1952).
A party seeking a new trial based on a claimed false response by a juror during voir dire must show, inter alia, (1) a question propounded was straightforward and not reasonably susceptible to misinterpretation; (2) the juror gave an untruthful answer; and (3) the inquiry concerned material and relevant matter to which counsel may reasonably have been expected to give substantial weight in the exercise of peremptory challenges. Mitchell v. State, 458 So.2d 819, 821 (Fla. 1st DCA 1984).
Here, the defendant made no showing that the juror's false response was material, that is, so substantial and important that if the facts were known, Blaylock may have been influenced to peremptorily *1107 exclude Smoak from the jury. Mitchell, 458 So.2d 819. Smoak testified truthfully as to the material fact that he had been taken as a hostage victim in a criminal incident.[1] Whether the incident arose out of a robbery or some different crime was not shown to be significant. Further there was no misrepresentation as to whether Smoak's experience resulted in emotional trauma which might have affected his performance as a juror in this homicide case. Having purposefully chosen not to further inquire into the matter the first time, the appellant is not entitled by a post-trial motion to a "second bite." Our conclusion here, that the nature of the offense leading to the hostage situation was not material, is supported by the fact that the jury ultimately accepted by the defendant included a recent armed-robbery victim.
In Florida before a new trial may be granted based on juror nondisclosure, as distinguished from a false response, the complaining party must prove three things: (1) the facts must be material, (2) the facts must be concealed by the juror during voir dire, and (3) the failure to discover the concealment was not due to the complaining party's lack of diligence. Perl v. K-Mart Corp., 493 So.2d 542 (Fla. 3d DCA 1986); Schofield v. Carnival Cruise Lines, 461 So.2d 152 (Fla. 3d DCA 1984), rev. denied, 472 So.2d 1182 (Fla. 1985); Skiles v. Ryder Truck Lines, Inc., 267 So.2d 379, 380 (Fla. 2d DCA 1972), cert. denied, 275 So.2d 253 (Fla. 1973).
Smoak was never asked if he had witnessed other crimes. The question whether any juror had been "exposed" to mental illness or emotional problems was vague, as the trial court noted, and was more suggestive of a contact with others who had such problems. Smoak's answer, viewed in that light, was complete. Any nondisclosure in this case resulted from the defense team's decision to not inquire thoroughly into the hostage incident or their failure to ask about other crimes.
No reversible error is demonstrated in the trial court's exclusion of testimony by the defendant's uncle concerning statements made by the defendant  two weeks prior to the shooting  which the jury, allegedly, could have considered as evidence that the defendant was delusional. At trial, defense counsel argued that the statements should be admitted through the uncle's testimony as nonhearsay. When the trial court announced a compromise ruling  that those statements could be admitted through the testimony of the defendant's two psychiatric experts  defense counsel failed to renew the objection. From his silence complete satisfaction could be inferred. We need not decide, however, whether the issue was adequately preserved for appellate review, because the trial court's ruling was eminently correct.
The proffered testimony  that in the uncle's opinion the defendant was insane  was based on statements made by the defendant two weeks prior to the shooting.[2] A lay person is not competent to give an opinion concerning a defendant's sanity when that opinion is based solely on events and observations made at a time remote from the crime. Such testimony is the domain of psychiatric experts. Garron v. State, 528 So.2d 353, 357 (Fla. 1988) ("A nonexpert is not competent to give lay opinion testimony based on his personal observation that took place a day removed from the events giving rise to the prosecution.").
Blaylock's third point is that the trial court erred in permitting the prosecutor to inform the jury of Blaylock's pre-Miranda[3] request to speak to an attorney. *1108 During the half-hour period following the murder, while Blaylock sat armed in a nearby office of the family business, he told police officers waiting outside that he wanted to speak to Mike Marcus, a family attorney. The prosecutor introduced Blaylock's request for an attorney as evidence of the defendant's sanity. Blaylock argues that such evidence should have been excluded because, in a post-Miranda setting, a request for an attorney may not be used to rebut an insanity defense, Wainwright v. Greenfield, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986); State v. Burwick, 442 So.2d 944 (Fla. 1983), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984); Diaz v. State, 492 So.2d 1144 (Fla. 3d DCA 1986), and that a different rule should not be applied here merely because the police had not yet read the defendant his rights.
The state's obligation to warn of the right to remain silent is triggered when a suspect is taken into custody. Miranda does not apply outside the context of inherently coercive custodial interrogation. Roberts v. United States, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). There is no authority or logical reason for an extension of the Miranda rule to statements made voluntarily before a suspect is taken into police custody. As explained in Greenfield, the reason the prosecutor may not comment on a defendant's post-Miranda silence is because the Miranda warnings contain an implicit assurance that silence, which includes the statement of a desire to remain silent until an attorney has been consulted, will carry no penalty, and breaching that assurance is an affront to the fundamental fairness that the due process clause requires. But where, as here, the defendant was not in police custody and was not induced by the government into any communication that would have been otherwise protected, Miranda is not applicable. Moreover, it is not unfair to permit the State to use the defendant's non-custodial request for counsel, made at the scene of the crime, as evidence that he, at the time of the offense and contrary to his own assertion, was capable of distinguishing right from wrong. Where sanity is at issue, a defendant's request for an attorney, unlike silence, may have probative evidentiary value. Allah v. State, 471 So.2d 121, 125 (Fla. 3d DCA 1985) (Pearson, Daniel S., J., specially concurring), rev. denied, 485 So.2d 426 (Fla. 1986).
On the last point, a review of the record shows that the prosecutor's comments in closing argument, considered in context, were not an impermissible denigration of the insanity defense. It was permissible for the prosecutor to argue to the jury that based on all the facts, Blaylock's reliance on an insanity defense was incredible. The remarks were made within the context of asking the jury to consider all the evidence and thus were proper, White v. State, 377 So.2d 1149 (Fla. 1979), and are distinguishable from an impermissible argument which denigrates the insanity defense in general. Compare Rosso v. State, 505 So.2d 611 (Fla. 3d DCA 1987) (new trial required where prosecutor's disparagement of the insanity defense as a legal defense exceeded all acceptable bounds of advocacy).
AFFIRMED.
NOTES
[1] On the facts of this case we find inapplicable the line of cases relied on by the appellant which hold that failure of a juror to disclose the material fact of participation in a crime by the juror or the juror's family necessitates a new trial. See Ex parte Ledbetter, 404 So.2d 731 (Ala. 1981); Herrera v. State, 665 S.W.2d 497 (Tex. App. 1983); Salazar v. State, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978); United States v. McCorkle, 248 F.2d 1 (3d Cir.1957).
[2] The statements of Blaylock on which the uncle based his opinion that Blaylock was delusional were, "Wayne [the victim] is evil, Denise and her baby are in danger," and "something must be done."
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).